UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                      :
                                                            :     Chapter 11
ODONATA Ltd,, d/b/a Cowlicks Japan,                         :
                                                            :     Case No. 22-10946 (MEW)
                                         Debtor.            :
------------------------------------------------------------x
ODONATA LTD., d/b/a Cowlicks Japan,                         :
                                                            :
                                         Plaintiff,         :
                                                            :
                  - against -                               :     Adv. Pro. No. 22-01121 (MEW)
                                                            :
BAJA 137, LLC,                                              :
                                                            :
                                         Defendant.         :
------------------------------------------------------------x
BAJA 137 LLC,                                               :
                                                            :
                        Third Party Plaintiff,              :
                                                            :
                  - against -                               :
                                                            :
ANGEL NEIVES,                                               :
                                                            :
                        Third Party Defendant.              :
------------------------------------------------------------x

## DECISION AFTER TRIAL

Debtor Odonata Ltd. (**"Odonata"**) is the owner and operator of a hair salon that has operated under the name "Cowlicks Japan." It leased space (the "**Premises**") from Defendant Baja 137 LLC ("**Baja**"). In 2021, Odonata and Baja engaged in negotiations regarding the possible modification and extension of the lease. The negotiations led to a proposed lease amendment that was executed by Odonata and that was sent to Baja for its signature. However, Baja informed Odonata that it would not sign the amendment as drafted, and that the terms of any amendment would need to be adjusted.

1

Odonata promptly sued in New York state court, contending that the lease amendment should be regarded as a valid and enforceable contract or, alternatively, that Baja had engaged in fraud during the negotiation process. The state court dismissed the contract claims, and that dismissal was affirmed on appeal. The parties agree that the only issue remaining for trial is Odonata's fraud claims and Baja's third-party claim, in which Baja seeks to enforce a guaranty of the lease that was executed by Mr. Nieves, the sole owner of Odonata.

Odonata removed its state court action to this Court after the filing of Odonata's bankruptcy petition. The parties engaged in discovery that often was contentious, and Odonata's complaints about the adequacy of Baja's document production (and Odonata's requests for sanctions) were deferred until evidence as to such matters could be presented at trial.

Odonata and Baja have agreed that this Court has jurisdiction over the matter and they have agreed that this Court may enter a final judgment. They further agreed to a bifurcated trial under which the Court would first determine the merits of Odonata's fraud claim, with Odonata's damages to be determined in a separate trial if liability were found.

A Joint Pretrial Order was entered on April 26, 2023 that contains many stipulated facts and outlines the contentions of the parties. More particularly, Odonata contends that Baja "fraudulently induced [Odonata] to remain in the Premises . . . on false pretenses" and made "multiple material misrepresentations of fact" to Odonata regarding Baja's willingness to negotiate lease amendments and the acceptability of some of the modified lease terms that were under discussion. Odonata contends that it was fraudulently induced to delay its pursuit of other leasing opportunities until a time when those other opportunities were no longer available as a practical matter. Based on the same conduct, Mr. Nieves has argued that Baja's claim under the guaranty should be barred by unclean hands and/or breach of the implied covenant of good faith

and fair dealing. He has also argued that any damages owed by Baja to Odonata should be offset against any liability he owes under his guaranty.

The matter came on for trial on May 2, 2023. The Court heard the live testimony of Angel Nieves (Odonata's principal and sole shareholder) and David Ohebshalom (the principal and Managing Member of Baja). The parties also submitted the deposition testimony of Yoni Hadar, a director of Meridian Capital Group/Meridian Retail Leasing ("**Meridian**") who participated in the negotiation of the terms of the proposed lease amendment. The parties also entered many exhibits into evidence.

I have considered the evidence, and for the reasons stated below I hold that Plaintiff has failed to offer sufficient proof of its allegations of fraud. For the same reasons I conclude that Mr. Nieves has not proved that Baja engaged in any behavior that bars the enforcement of the guaranty. In addition, I find that there were no deficiencies in Baja's document productions that warrant the imposition of any sanctions. Mr. Nieves's request for an offset to his guaranty obligations, based on the amount of any damages awarded in favor of Odonata on the fraud claim, is moot in light of my determination that Odonata has failed to prove that fraud occurred.

### Findings of Fact

The parties disagree over the implications to be drawn from the facts, but most of the underlying facts are not substantially disputed, and many are the subject of stipulations set forth in the Joint Pretrial Order.

1.  Odonata and a prior owner of the Premises entered into a lease on August 30, 2009 (the "**Lease**"). Section 56.2 of the Lease stated expressly that the Lease "may not be changed, modified abandoned or discharged, in whole or in part, nor any of its provisions waived except by a written instrument which (a) expressly refers to this Lease, and (b) is executed by the

3

party against whom enforcement of the change, modification, abandonment, discharge or waiver is sought."

2. Mr. Nieves executed a guaranty of Odonata's obligations under the Lease. Paragraph 18 of the guaranty stated that the guarantor's obligations would be limited in the event that Odonata were to give written notice that it would vacate the premises and if Odonata actually vacated and surrender the premises.

3. The parties to the Lease agreed to a First Amendment and Renewal of Lease on or about August 3, 2014. The amendment extended the lease term through August 31, 2016.

4. Baja stepped into the shoes of the prior owner of the Premises when Baja acquired the property. Baja and Odonata entered into a Second Amendment to Lease in September 2016. The Second Amendment extended the Lease term through August 31, 2021. Paragraph 23 of the Second Amendment to Lease stated that "[t]his Second Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought."

5. In September 2016 Mr. Nieves also executed a revised guaranty. The 2016 guaranty provided, in paragraph 8, that if Odonata delivered a "Surrender Declaration" at least 120 days prior to the date it actually vacated the premises (the "**Vacating Date**") then Mr. Nieves would be relieved from all obligations accruing after the Vacating Date.

6. Beginning in December 2020, Odonata informed Baja that Odonata was having financial problems due to losses of business during the pandemic. Odonata asked for rent concessions and argued that it was paying above-market rents under the existing Lease. When Baja declined to grant concessions, Odonata sent a written Surrender Declaration on March 8, 2021. The Surrender Declaration stated that the premises would be vacated on July 7, 2021.

7. On March 17, 2021, Mr. Ohebshalom sent an email to Mr. Nieves that expressed a change of heart about the parties' lease negotiations. The email stated (among other things) that Odonata had been the "BEST TENANT any landlord can ask for," that Baja wished to "do whatever reasonably possible to keep Tenant in place," and that Baja therefore was making an offer to modify the Lease terms and to extend the term of the Lease, "which of course shall not be binding unless signed by Landlord and Tenant." Mr. Ohebshalom acknowledged that "the contracted rent for the salon exceeds current market rent" and offered both to reduce the rent and to forgive some portions of rents.

8. Mr. Nieves responded to Mr. Ohebshalom in an email dated April 1, 2021. He asserted that Odonata had visited other properties and received "generous offers to rent space" and that he was preparing to move his business unless a suitable agreement could be worked out with Baja. He then made a counterproposal that sought additional rent forgiveness and changes to other terms.

9. Mr. Ohebshalom responded to Mr. Nieves's counterproposal in an email dated April 5, 2021. He stated that Mr. Nieves would receive Baja's formal counterproposal that same day and that an advisor (Yoni Hadar) was finalizing "a few analytical points" before the counterproposal would be sent. Mr. Hadar sent an email later that same day that outlined proposed terms. Mr. Hadar's April 5, 2021 email stated that "[a]ll of this is subject to an agreed upon lease amendment and signed copies by both parties."

10. After further discussions, Mr. Hadar sent an email to Mr. Nieves on April 15, 2021, that proposed terms for a Lease amendment and stated that "I have spoke [sic] with David, and we are prepared to move forward with" the terms set forth in the April 15 email.

5

11. Mr. Nieves testified at trial that in February and March 2021 (including at the time he delivered the Surrender Declaration on March 8, 2021) he had identified other locations to which he could have moved his business and at which he would have paid lower rents than those set forth in his then-current lease with Baja. The documentary evidence does not fully confirm the chronology to which he testified. For example, Exhibit FF (an email chain with the managing agent for a property on 17th Street) includes an email dated March 8, 2021 – the same day that the Surrender Declaration was delivered to Baja – in which Mr. Nieves said that he did not intend to make a proposal with respect to one of the properties that he had identified as an alternative space. Exhibits FF and GG also make clear that Mr. Nieves's negotiations with owners of other properties continued into April 2021, and that he had not reached final terms with the owners of the alternative spaces. Nevertheless, the exhibits do confirm that some other parties were offering attractive terms.

12. On April 23, 2021, Odonata provided Baja and Meridian with a copy of a proposed lease amendment. Meridian returned a "redlined" mark-up of the proposed lease amendment on May 3, 3021. Mr. Ohebshalom confirmed (in portions of his deposition testimony that were offered in evidence) that he was aware of the proposed terms and had approved them.

13. Odonata did not immediately respond to the May 3, 2021 proposal, and the witnesses at trial did not explain the delay. Mr. Nieves testified that on May 13, 2021 Mr. Hadar called and gave Mr. Nieves an ultimatum either to accept the proposal or to leave the premises. Subsequently, on May 19, 2021, Mr. Nieves sent an email to Mr. Hadar stating that Mr. Nieves had "elected to accept the offer." He stated that his attorney would update the documents to reflect the changes that Meridian had forwarded.

6

14.     On May 27, 2021, Mr. Hadar requested that Odonata sign and send a final lease amendment so that it could be countersigned by Baja. On May 31, 2021, Mr. Nieves signed a proposed lease amendment on behalf of Odonata. The signed document was forwarded to Baja and to Mr. Hadar on June 1, 2021 with a request that it be countersigned by Baja.

15.     On June 15 and 16, 2021, Mr. Nieves sent follow-up emails asking Baja to execute the lease amendment. On June 17, 2021, Mr. Ohebshalom sent an email stating that he had been busy and that he would review the documents by the next Monday, June 21, 2021.

16.     On June 21, 2021, Mr. Ohebshalom sent an email to Mr. Nieves and to Odonata's counsel that stated the following:

> I have been giving this a *lot* of thought over the last month or so. In that time and even a month or more earlier, times have **drastically** changed (thankfully for the better). The time you dropped off the notice and we started talking about possibility [sic] modifying the lease compared to now is like night and day. I must state simply that the terms that you and Yoni discussed, and the proposed Third Amendment to Lease Agreement and related Good Guy Guaranty are not acceptable to the landlord. Like I have told you in the past, I would like for you to continue your tenancy as you have been a great tenant through 2020 but for that to happen we have to renegotiate and agree upon (in writing of course) fair terms. It can't be a 5-year ding to the landlord, plus a rent waiver, because 1 or tops 1.5 COVID-related slow years. If you are amenable to doing so then I will put together new terms. If you are not amenable then I respect that and we will abide by the terms of the current lease (as most recently amended by the 2016 Second Amendment to Lease) and related Guaranty.

(Emphases in original.)

17.     Mr. Nieves testified that as a practical matter the other leasing opportunities that he had investigated were no longer available to him in June 2021. He testified that he would have needed two or three months to build out new space and to move his business, and that he did not have that much time given the July 7, 2021 surrender date that he had specified in the prior Surrender Declaration. However, Mr. Nieves did not ask for a short extension of the Lease, or for a deferral of the surrender date, or for other accommodations to permit him time to find

7

other options. Instead, Odonata took the position that the proposed Lease amendment was binding notwithstanding Baja's refusal to sign it.

18.     Odonata tendered rent on July 5, 2021 in the amounts specified in the proposed amendment. Baja refused the tender and stated that the existing 2016 Amendment to Lease was in effect "[u]nless and until a written agreement is signed by both BAJA 137 LLC and Odonata Ltd."

19.     On July 8, 2021 Odonata filed suit in the New York State Supreme Court, asserting causes of action for specific performance, breach of contract, breach of implied covenant of good faith and fair dealing, fraud/fraudulent inducement, and promissory estoppel. On February 7, 2022, the State Court dismissed all of the contract-based claims, leaving only the claims for damages based on alleged fraud and fraudulent inducement. On June 28, 2022, the Appellate Division, First Department, affirmed the dismissal of the contract-based claims.

20.     Odonata filed its bankruptcy petition on July 6, 2022. The State Court Action was removed to the United States District Court for the Southern District of New York on July 27, 2022, and was then transferred to this Court.

21.     Odonata has occupied the leased premises continually since June 2021, notwithstanding its prior statement of an intent to surrender the premises and notwithstanding the end of the stated Lease term. The parties confirmed during the trial that Odonata paid no rents during the period February 2021 through July 2022, and that since the bankruptcy filing Odonata has paid "use and occupancy" payments of $6,250 per month to Baja.

22.     Mr. Nieves testified that he made no efforts to find alternative space from the time he received Mr. Ohebshalom's email on June 21, 2021 through the end of September 2021. It is

not clear whether he did or did not make such efforts after September 30, 2021, though he testified vaguely that he made a few inquiries at some point in 2022.

23.     Odonata stated in the Joint Pretrial Order that it seeks damages for the alleged "devastating closure of its business operations." However, Odonata admitted at trial that it has continued to conduct its business at the premises at all times since July 2021.

### Odonata's Fraud Claims and the Relevant Legal Standards

Odonata contends that Baja never actually intended to agree to amended lease terms and that it pretended to do so in order to induce Odonata to remain in the premises for a longer time, at which point the surrender date would be imminent and Odonata's choices would be limited. It contends that Baja falsely stated that it was willing to negotiate, that Baja and Mr. Hadar deliberately misrepresented their positions when they stated that certain modified lease terms were acceptable to them as a business matter, and that Baja falsely represented that it would be willing to incorporate the modified terms into a written amendment to the Lease.

The Court asked the parties to submit post-trial letters confirming their contentions as to the relevant elements of Odonata's fraud claims and as to the burden of proof that Odonata must satisfy in order to prevail on its claims. The parties agree that under New York law Odonata is required to prove its claims of fraud by clear and convincing evidence, and not merely by a preponderance of the evidence. *See Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10 (1972). They also agree that as a general matter a fraud claim requires proof of a material representation of fact, the falsity of that representation, scienter on the part of the defendant, reliance by the plaintiff and resulting injury. *See, e.g., May Dep't Stores Co. v. Int'l. Leasing Corp.*, 1 F.3d 138, 141 (2d Cir. 1993) (stating the elements of a fraud claim under New York law). However, there are other nuances in New York State law regarding alleged "fraudulent

9

statements of intention" that were not addressed in the parties' submissions and that need to be clarified and applied in considering Odonata's claims.

As a general matter, New York requires that a fraud claim be premised a misrepresentation of material fact. *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995). "General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the [fraud] claim." *Id.* at 318; *see also Rocanova v. Equitable Life Assur. Soc'y*, 83 N.Y.2d 603, 614 (N.Y. 1994) ("a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations"). Promissory statements as to what will be done in the future are not statements of fact and normally are not actionable as fraud. *Sabo v. Delman*, 3 N.Y.2d 155, 160 (N.Y. 1957).

Nevertheless, if a statement of intention was "actually made with a preconceived and undisclosed intention of not performing it," that false statement may be treated as a misrepresentation of a material existing fact. *Id.* In this regard, it is not enough to show that a defendant changed its mind, or even that a defendant broke a promise. *Adams v. Clark*, 239 N.Y. 403, 410 (N.Y. 1925) ("Disappointed hopes are not the basis of legal liability . . . Proof of failure to keep a promise may tend to establish the intent not to keep it, but common experience teaches us that such proof is not conclusive; that the making of an unkept promise does not imply of necessity in all cases a present intention not to keep the promise.") A fraud claim that is premised on alleged false statements of intention will only succeed upon proof that the defendant made statements of intent that it knew would not be performed or with a present intention not to perform, and did so for the purpose of misleading the plaintiff. *Willsen Assocs. Real Estate Corp. Inc. v. Pizilly*, 204 A.D.2d 777, 778 (3d Dep't 1994).

These authorities make clear that Odonata must prove that Baja did not merely change its mind at the conclusion of the parties' discussions, but that Baja and its representatives had lied about their own intentions and about Baja's willingness to consider proposed modifications to the Lease, resulting in justifiable reliance by Odonata and injury to Odonata.

## Discussion

I.   **Odonata's Fraud Claim**

It is quite obvious, after hearing testimony, that Mr. Nieves feels wronged by Baja's last-minute change in position.  He plainly feels that fairness and equity (whether under the legal rubrics of contract or fraud) should require Baja to live with the terms that the parties had tentatively negotiated.  In that regard, Mr. Nieves made clear at trial that his primary belief is that the parties had an agreement that should be enforceable as a matter of contract law, and that Baja should not have been permitted to change its mind in the way that it did.  However, parties can and often do specify that they will not be bound in contract unless and until a written agreement is signed, and it is well-settled under New York law that if the parties do so then no contract exists unless and until a written agreement has been executed.  *Scheck v. Francis*, 311 N.Y.S.2d 841, 843 (N.Y. 1970).  This is true even if the parties have otherwise agreed upon all the business terms of a transaction.  *Schwartz v. Greenberg*, 304 N.Y. 250, 254 (N.Y. 1952); *Lost Creek Assoc. v. Marine Midland Bank*, 741 N.Y.S.2d 115, 116 (N.Y. App. Div. 2d Dep't 2002).  A contract requires not just an agreement on business terms, but an agreement to be legally bound to those terms, and if any party expresses an intent not to be bound unless and until a written agreement is signed, then no contract exists unless and until that condition is satisfied.

In this case, the second amendment to the Lease stated clearly that no further modifications or amendments to the Lease could be made except in a writing signed by both

parties. In addition, Mr. Ohebshalom and Mr. Hadar stated expressly on at least two occasions that their proposals would not result in a binding contract unless and until a lease amendment had been reduced to writing and signed by both parties. The Appellate Division held, among other things, that under these circumstances no contract existed:

> The commercial lease and the second amendment to the lease expressly provided that any changes to the agreement could only be made in writing and signed by the party against whom enforcement of any modification is sought. The purported third amended lease not only modified plaintiff's rent obligations, defendant would have also forgiven some unpaid rent and late fees. The email exchanges unequivocally demonstrate that plaintiff was informed and was aware that the signature of all parties was required to amend the lease a third time.
>
> ***
>
> Although the amended lease allowed for its execution in counterparts, it did not eliminate the need for both parties' signature on the amended lease in order for it to be a binding agreement. Furthermore, a lease is the conveyance of real property by the landlord to the tenant, and in order for it to be effective it must be in a writing subscribed by the party to be charged (General Obligations Law § 5-703[2]). Because the third amendment was intended to be for a time period longer than one year, it required a signed agreement to satisfy the Statute of Frauds (General Obligations Law § 5-703[1].)

*See Odonata Ltd. v. Baja 137 LLC*, 206 A.D.3d 567, 569 (1st Dep't 2022). The Appellate Division also rejected Odonata's contentions that a contract should be found based on theories of promissory estoppel. It held that the need for both parties' signatures was "a constant thread throughout the parties' emails and negotiations" and that it therefore was "unreasonable" for Odonata to have relied on the draft agreement as being binding and enforceable. *Id.* at 569-70. Finally, the Appellate Division held as a matter of law that the facts alleged by Odonata did not "shock the conscience" and that, based on the documentary evidence, "Plaintiff had no reasonable basis to believe it had a binding agreement with defendant." *Id.* at 570.

That leaves only Odonata's fraud claim. As noted above, however, the mere fact that Baja changed its mind at the last minute about a proposed contract (as Baja was entitled to do as a matter of New York contract law) is not enough to establish liability. Instead, Odonata was required to prove that Baja did not merely have a change of heart, but that its prior statements about its willingness to negotiate and the acceptability of certain terms were intentionally false at the time they were made.

I have considered the exhibits and the testimony of the witnesses, and I find that Odonata has failed to prove that any fraud occurred. There was no evidence at trial of any actual intent to deceive. Odonata urges the Court to find such an intent based on circumstantial evidence, but the best that could be said of most of the evidence is that it merely did not preclude the possibility of a deceptive intent. There is nothing in the evidence that shows that fraud was a more likely explanation of what occurred, and therefore nothing that would have satisfied even a normal "preponderance of the evidence" standard, let alone the more stringent "clear and convincing evidence" burden that is applicable to the claims Odonata has asserted.

Odonata argues, for example, that I should find an intent to defraud based on Baja's assertion that market circumstances had changed during the short time that passed between March 2021 and June 2021. However, no expert testimony or other evidence of market rents was offered. Nor was any other evidence offered to suggest that Mr. Ohebshalom did not actually believe that market conditions had changed. More importantly, no evidence was offered that Mr. Ohebshalom had not believed his own prior statements about market rents at the time those prior statements were made, or that such prior statements had just been part of a preconceived plot to lure Odonata into a vulnerable position. In fact, Odonata's claims that it was injured by Baja's conduct are premised in part on the contention that in March 2021 various

13

alternative properties were available for rent at attractive prices, but that similar opportunities were no longer available in June 2021 and thereafter. Odonata's own claims of "injury" therefore provide some validation of Mr. Ohebshalom's statements about changes in the relevant market.

In any event, I have considered the testimony of Mr. Ohebshalom and I have evaluated his credibility. I have also reviewed the transcript of Mr. Hadar's deposition. I find that they were honest about their intentions and about their tentative positions as to possible Lease amendments. Mr. Ohebshalom changed his mind at the last minute, and I understand why that is frustrating for Odonata as a business matter. However, there was no intent to deceive, no actual deception and no fraud.

## II.    Odonata's Discovery Complaints and Requests for Sanctions

Odonata also complained about Baja's compliance with discovery demands. As noted above the Court deferred consideration of Odonata's complaints and its requests for sanctions until trial, at which point evidence could be offered as to whether reasonable searches had been conducted and completed disclosures had been made, or whether the circumstances were such that sanctions against Baja were appropriate, including the possibility of foreclosing Baja from disputing certain contested allegations. The evidence at trial failed to show that Baja and its representatives had flouted their discovery obligations or that any sanctions are appropriate.

## III.    Mr. Nieves's Affirmative Defenses to the Guaranty Claim

Mr. Nieves has argued that Baja should be barred from enforcing Mr. Nieves' guaranty of Odonata's obligations on the ground that Baja has acted with "unclean hands" or worse. However, "[t]he doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages." *Manshion Joho Ctr. Co., Ltd.. v. Manshion Joho Ctr., Inc.*, 24 A.D.3d

189, 190 (1st Dep't 2005). "Unclean hands" therefore cannot be asserted as a defense to a guaranty claim. *LMezz 250 W90 LLC v. Ringel*, Index No. 654469/2016, 2018 N.Y. Misc. LEXIS 966, at *22 (Sup. Ct. N.Y. Cty. Mar. 6, 2018).

In addition, an "unclean hands" defense (when available) requires proof of conduct that was unconscionable or immoral. *Levkoff v. Soho Grand-W. Broadway, Inc.*, 115 A.D.3d 536, 537 (1st Dep't 2014). I understand that Mr. Nieves believes that Baja's conduct met that standard, but the evidence at trial did not sustain that contention. Odonata proved merely that Baja changed its mind and exercised its rights under New York contract law, not that Baja committed fraud or otherwise engaged in unconscionable behavior. That is my conclusion based on the evidence at trial. I note that my conclusion based on the evidence is consistent with the determination by the Appellate Division that as a matter of law that the facts alleged by Odonata did not "shock the conscience" and therefore did not provide a basis for relief from the requirements of the Statute of Frauds. *See Odonata Ltd. v. Baja 137 LLC*, 206 A.D.3d at 570.

Mr. Nieves also has argued that Baja's actions violated the implied covenant of good faith and fair dealing. New York endorses the general rule that every contract includes an implied covenant of good faith and fair dealing. *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 319; (1995); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). Sometimes that general rule is misinterpreted, as though it forbids anything that one contracting party might do that is mean-spirited or that is contrary to the economic interests of an opposing party. The implied covenant of good faith and fair dealing actually has a narrower scope. It comes into play where "a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Jaffe v. Paramount Commc'ns, Inc.*, 222 A.D.2d 17, 22-23 (1st Dept. 1996).

15

Transactions that lack economic substance or that elevate form over substance, and that merely represent efforts to undermine another party's contract rights, are prime examples of matters that may constitute breaches of the implied covenant of good faith and fair dealing. *See Fleet Capital Corp. v. Yamaha Motor Corp.*, No. 01 Civ. 1047 (AJP), 2002 U.S. Dist. LEXIS 18115, at *126-127, 2002 WL 31174470, at *36-37 (S.D.N.Y. Sept. 25, 2002) (direct payment of proceeds to debtor's vendor, in effort to defeat lender's superior rights to proceeds received by the debtor, violated the implied covenant of good faith and fair dealing in an intercreditor agreement); *N. Hill Funding of N.Y., LLC v. Amincor Other Assets, Inc.*, Index No. 653092/14, 2016 N.Y. Misc. LEXIS 4922, at *20-21 (Sup. Ct. N.Y. Cty. Jan.17, 2016) (looking to the "economic substance" of transactions and finding that an assignment of assets was improperly designed to frustrate the priority rights of another creditor); *Vista Outdoor Inc. v. Reeves Family Trust*, 234 F. Supp. 3d 558, 565-567 (S.D.N.Y. 2017) (sellers of interests in corporation breached implied covenant of good faith and fair dealing to purchaser where final sale price was tied to an earn-out based on corporation's post-sale profits, and defendants purchased goods from the corporation for the purpose of artificially inflating profits); *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-632 (S.D.N.Y. 2010), *aff'd and remanded*, 381 F. App'x 117 (2d Cir. 2010) (summary order) (plaintiff pleaded a valid claim for breach of good faith and fair dealing where lender who could not assign a loan without the borrower's consent instead assigned a 90% participation interest in loan payments, giving the assignee "much of the substance of the [otherwise] forbidden assignment.")

      The evidence at trial did not identify any actions by Baja that should be considered violations of an implied covenant of good faith and fair dealing. Essentially, Mr. Nieves' affirmative defense is premised on the contention that an intentional fraud occurred. I have

16

found that no such fraud occurred for the reasons stated above, and no other theory has been offered as to why Baja's behavior should be considered a violation of any implied obligations under Mr. Nieves's guaranty.

## Conclusion

For the foregoing reasons, the Court holds that Baja is entitled to judgment in its favor with respect to Odonata's fraud claims and with respect to Mr. Nieves's defenses to the guaranty based on theories of unclean hands and breach of the implied covenant of good faith. The denial of Odonata's fraud claim renders moot Mr. Nieves's contention that his guaranty liability should be offset by the amount of any damages awarded to Odonata. I further hold that no discovery violations occurred and that no discovery sanctions are proper. The parties are directed to appear at a conference on July 7, 2023 at 10:00 a.m. to discuss the order(s) and judgment(s) that should be entered based on these determinations and the extent to which further proceedings are needed.

Dated: New York, New York
      June 28, 2023

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge